[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *State ex rel. Brown v. Ashtabula Cty. Bd. of Elections,* **Slip Opinion No. 2014-Ohio-4022.**]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-4022

THE STATE EX REL. BROWN ET AL. *v.* ASHTABULA COUNTY

BOARD OF ELECTIONS ET AL.

[**Until this opinion appears in the Ohio Official Reports advance sheets,**

**it may be cited as** *State ex rel. Brown v. Ashtabula Cty. Bd. of Elections,*

**Slip Opinion No. 2014-Ohio-4022.**]

*Elections—Mandamus—R.C. 3513.04—Writ sought to compel county board of elections to place relator's name on ballot as judicial candidate—Writ denied.*

(No. 2014-1405—Submitted September 3, 2014—Decided September 16, 2014.)

IN MANDAMUS.

————————————

**Per Curiam.**

{¶ 1} Relators, Thomas Brown, Clifford Henry, and Michael Vandervort,[1] seek a writ of mandamus compelling respondents, the Ashtabula County Board of Elections and its director, Duane Feher, to place Brown's name

_____

[1] Henry and Vandervoort are registered voters in Ashtabula County.

on the November 4, 2014 ballot as a judicial candidate for the Ashtabula County Western Area Court. Because relators have not shown a clear entitlement to this extraordinary relief, we deny the writ.

**Facts and Procedural History**

{¶ 2} Brown ran unsuccessfully to become the Democratic nominee for a seat on the Ashtabula County common pleas court in the Democratic Party primary election held on May 6, 2014.

{¶ 3} On July 21, 2014, he filed nominating petitions to be a candidate for judge on the Ashtabula County Western Area Court in the November 4, 2014 general election. The Ashtabula County Board of Elections, relying solely on R.C. 3513.04, rejected Brown's petitions.

{¶ 4} Relators filed this action seeking a writ of mandamus to compel the board to certify his candidacy for the Western Area Court, asserting that R.C. 3513.04 is unconstitutional. We permitted Ohio Attorney General Michael DeWine to intervene as a respondent to defend the constitutionality of the statute.

**Laches**

{¶ 5} The attorney general asserts that relators unreasonably delayed in seeking relief and that this action is barred by the doctrine of laches. He suggests that Brown knew or should have known that he intended to challenge the constitutionality of R.C. 3513.04 on May 6, 2014, when he lost the primary election, and that relators failed to exercise utmost diligence by not filing suit on July 24, 2014, when Brown first learned that the board would not certify his candidacy.

{¶ 6} "The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party." *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections*, 74 Ohio St.3d 143, 145, 656 N.E.2d 1277 (1995). Laches may bar relief in an election-related matter if the

2

person seeking relief fails to act with the " 'utmost diligence.' " *State ex rel. Monroe v. Mahoning Cty. Bd. of Elections*, 137 Ohio St.3d 62, 2013-Ohio-4490, 997 N.E.2d 524, ¶ 30, quoting *State ex rel. Fuller v. Medina Cty. Bd. of Elections*, 97 Ohio St.3d 221, 2002-Ohio-5922, 778 N.E.2d 37, ¶ 7.

**{¶ 7}** Relators could not have filed this action on May 6, 2014, when Brown lost the primary election, because relators had no claim for relief until the board of elections refused to place Brown's name on the ballot. *State ex rel. Linnabary v. Husted*, 138 Ohio St.3d 535, 2014-Ohio-1417, 8 N.E.3d 940, ¶ 16 ("Linnabary did not have a claim to assert until [the secretary of state] removed his name from the ballot"). Nor were respondents prejudiced by the failure to file suit on July 24, 2014, when Brown learned that the board would not certify his candidacy. Had relators filed suit at that time, this mandamus action would not have been docketed as an expedited election action, and the case might not have been decided before the September 20, 2014 deadline for sending absentee ballots to military and overseas voters, potentially placing the board in a significantly worse position.

**{¶ 8}** We therefore reject the claim that laches bars this action.

### Mandamus

**{¶ 9}** The requirements for a writ of mandamus are well established: (1) the relator must demonstrate a clear legal right to relief, (2) the respondent must have a clear legal duty to perform the requested relief, and (3) there must be no adequate remedy in the ordinary course of law. *State ex rel. Harris v. Rhodes,* 54 Ohio St.2d 41, 374 N.E.2d 641 (1978).

**{¶ 10}** And as we explained in *State ex rel. Pressley v. Indus. Comm.,* 11 Ohio St.2d 141, 228 N.E.2d 631 (1967),

"the issuance of a writ of mandamus rests, to a considerable extent
at least, within the sound discretion of the court to which

application for the writ is made. The writ is not demandable as a matter of right, or at least is not wholly a matter of right; nor will it issue unless the relator has a clear right to the relief sought, and makes a clear case for the issuance of the writ. The facts submitted and the proof produced must be plain, clear, and convincing before a court is justified in using the strong arm of the law by way of granting the writ."

*Id.* at 161, quoting 35 Ohio Jurisprudence 2d, Discretion as to Issuance, Generally, Section 37, at 285.

{¶ 11} A writ of mandamus is an extraordinary remedy, exercised by this court with caution and issued only when the right is clear. *State ex rel. Taylor v. Glasser,* 50 Ohio St.2d 165, 166, 364 N.E.2d 1 (1977); *State ex rel. Shafer v. Ohio Turnpike Comm.,* 159 Ohio St. 581, 589, 113 N.E.2d 14 (1953).

{¶ 12} But relators are not only required to prove clear entitlement to relief, they must also overcome the presumption of constitutionality afforded to all acts of the General Assembly and demonstrate *beyond a reasonable doubt* that R.C. 3513.04 is unconstitutional. *State ex rel. Purdy v. Clermont Cty. Bd. of Elections,,* 77 Ohio St.3d 338, 345-346, 673 N.E.2d 1351 (1997); *State ex rel. Watson v. Hamilton Cty. Bd. of Elections*, 88 Ohio St.3d 239, 261, 725 N.E.2d 255 (2000) (applying presumption of constitutionality to statute setting forth qualifications for office of sheriff).

{¶ 13} The United States Constitution provides that states may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Article I, Section 4, cl. 1, and the Supreme Court has recognized that states retain the power to regulate their own elections. *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

4

**{¶ 14}** To assess the constitutionality of a state election law, the court must first "consider the character and magnitude of" the claimant's alleged injury. *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). If the regulation severely restricts voting rights, then strict scrutiny applies and the law must be narrowly tailored to advance a compelling state interest. *Burdick* at 434. We have explained that "a law severely burdens voting rights if it discriminates based on political content instead of neutral factors or if there are few alternative means of access to the ballot." *Watson*, 88 Ohio St.3d at 243, 725 N.E.2d 255. But "not every statutory restriction limiting the field of candidates need advance a compelling state interest," *id.,* and if the regulation is minimally burdensome and nondiscriminatory, then " 'the State's important regulatory interests are generally sufficient to justify' the restrictions," *Burdick* at 434, quoting *Anderson* at 788.

**{¶ 15}** Notably, we applied these standards to a prior version of R.C. 3513.04 in *Purdy* and upheld the statute against constitutional challenge. At that time, paragraph three of the statute stated: "No person who seeks party nomination for an office or position at a primary election * * * shall be permitted to become a candidate by nominating petition * * * at the following general election for any office by nominating petition or by declaration of intent to be a write-in candidate." Sub.S.B. No. 261, 146 Ohio Laws, Part VI, 10605, 10608. We concluded that this statute imposed only a "very limited" and slight burden on potential candidates, *Purdy*, 77 Ohio St.3d at 344, 673 N.E.2d 1351, "[did] not unreasonably interfere with the right of voters to have candidates of their choice placed on the ballot," *id*., and was nondiscriminatory, *id.* at 343, and we explained that "Ohio clearly has a legitimate interest in preventing potential conflicts among party members, an interest in preventing the possibility of voter confusion, and an interest in preventing candidacies that may conceivably be prompted by short-range goals," *id.* at 346.

**{¶ 16}** Following our decision in *Purdy*, the General Assembly enacted a number of amendments to R.C. 3513.04, and the statute now states:

> No person who seeks party nomination for an office or position at a primary election * * * shall be permitted to become a candidate by nominating petition * * * at the following general election for any office *other than the office of member of the state board of education, office of member of a city, local, or exempted village board of education, office of member of a governing board of an educational service center, or office of township trustee.*

(Emphasis added for new material since 1997.)

**{¶ 17}** Relators maintain that these amendments cannot survive strict scrutiny, because these provisions arbitrarily and invidiously discriminate against Brown and similarly situated individuals and severely burden fundamental rights to associate and vote by limiting the field of candidates available to voters. And, they contend, the restrictions imposed by the statute are purposeless; relators claim that any state interest in regulating partisan elections does not apply to candidates for nonpartisan office, that Brown's candidacy was not short-sighted, and that there is no chance of voter confusion or intraparty conflict in these circumstances.

**{¶ 18}** The attorney general responds that our decision in *Purdy* provides the rule of decision in this case, that the rational-basis test should guide our analysis, and that the legislature could reasonably conclude that "the risks associated with second-chance/sore-loser candidacies (and the overall effect on Ohio's electoral integrity) are lessened within the context of educational and/or highly localized positions" and that "there was more need to encourage and incentivize candidacy for such positions."

**{¶ 19}** It is not clear on this record that the amendments enacted in 1998 are unconstitutional solely because the statute now permits unsuccessful primary candidates the opportunity to file nominating petitions for some nonpartisan offices—member of the state board of education, member of a city, local, or exempted village board of education, member of a governing board of an educational service center, or township trustee. These amendments *increase* voter access and *lessen* the burdens on candidates who have run in a primary and who have elected to refile for the above designated offices. *See McDonald v. Bd. of Election Commrs. of Chicago*, 394 U.S. 802, 811, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (Illinois statute allowing some but not all inmates to receive absentee ballots was constitutional, and the fact "[t]hat Illinois has not gone still further, as perhaps it might, should not render void its remedial legislation"). And the statute remains nondiscriminatory; although these amendments may treat offices differently, all candidates are treated equally. Thus, any burden on voting rights remains, as the court in *Purdy* put it, "slight" and "very limited," and the state interest required to justify it is correspondingly small.

**{¶ 20}** There may be legitimate reasons that motivated the General Assembly to designate certain offices for different treatment, and we lack the benefit of a sufficiently developed record in this expedited election matter to definitively state that the legislature lacked any basis for its actions. For example, in this instance, having lost a primary election for common pleas court judge, relator Brown seeks the opportunity to run for a different judicial office at the general election held in the same year, which may be confusing to voters and provide an advantage over other judicial candidates; but because there are no primary elections for state board of education, there is no possibility of voter confusion in that instance. *See* R.C. 3513.259 ("Nominations of candidates for the office of member of the state board of education shall be made only by

7

nominating petition"). These are policy considerations that belong with the General Assembly, not the judiciary.

{¶ 21} It is not sufficient for relators to cast doubt on the constitutionality of this statute, nor is it the attorney general's burden to prove the statute constitutional; rather, relators must show beyond a reasonable doubt that R.C. 3513.04 is unconstitutional. This is so, because "[t]he ability to invalidate legislation is a power to be exercised only with great caution and in the clearest of cases." *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16.

{¶ 22} The opinion concurring in judgment misses the point. Relators seek extraordinary relief in this court and can obtain it only if they demonstrate clear entitlement to the writ. The standards articulated by the Supreme Court in *Anderson* and *Burdick* that apply in civil litigation challenging the constitutionality of ballot restrictions inform our analysis, but those cases are not writ actions and do not involve the unique burdens that control the adjudication of original actions in this court. Otherwise, this case would present nothing more than an action seeking a declaratory judgment that the statute is unconstitutional, and we lack original jurisdiction to grant a declaratory judgment. *State ex rel. Ministerial Day Care Assn. v. Zelman*, 100 Ohio St.3d 347, 2003-Ohio-6447, 800 N.E.2d 21, ¶ 22. Rather, the function of mandamus is to compel the performance of a present existing duty. *State ex rel. Willis v. Sheboy*, 6 Ohio St.3d 167, 451 N.E.2d 1200 (1983), paragraph two of the syllabus.

{¶ 23} The opinion concurring in judgment conflates the legal standards at issue here. Although it purports to apply the principles of the ballot-access cases in determining that R.C. 3513.04 is unconstitutional, it points to nothing in the post-1998 amendments to the statute that burdens the right to vote or access to the ballot. And it presumably agrees that any burden on Brown's candidacy is outweighed by the state's legitimate interests, because it would uphold the ballot

restrictions if severed from the post-1998 amendments. Rather, the opinion concurring in judgment purports to resolve an equal protection claim by severing language from the statute, and equal protection claims are subject to rational-basis review because "there is no fundamental right to run for public office." *State ex rel. Keefe v. Eyrich*, 22 Ohio St.3d 164, 165, 489 N.E.2d 259 (1986). This is the reason why relators have the burden to do more than simply cast doubt on the constitutionality of the statute to succeed.

{¶ 24} For these reasons, relators have not overcome the presumption of constitutionality, nor have they demonstrated that R.C. 3513.04 is unconstitutional beyond a reasonable doubt. Hence, they have not shown a clear entitlement to extraordinary relief. No writ will issue in such doubtful circumstances. Accordingly, we deny the requested writ of mandamus.

Writ denied.

O'DONNELL, KENNEDY, and FRENCH, JJ., concur.

O'CONNOR, C.J., and LANZINGER, J., concur in judgment only.

PFEIFER, J., dissents.

O'NEILL, J., not participating.

_____

**O'CONNOR, C.J., concurring in judgment only.**

{¶ 25} I concur in the judgment of the court that relators are not entitled to a writ of mandamus.[2] However, the opinion adopted by a plurality of the court employs the wrong legal standard to decide the case. I therefore write separately to clarify the constitutional issues at play in this case.

{¶ 26} We first considered the constitutionality of R.C. 3513.04 in *State ex rel. Purdy v. Clermont Cty. Bd. of Elections*, 77 Ohio St.3d 338, 673 N.E.2d 1351 (1997). As written at the time, R.C. 3513.04 operated to prevent

---

[2] I join the portion of the plurality opinion analyzing—and rejecting—the applicability of laches.

unsuccessful primary candidates from seeking election to a different office in the same election cycle, with no exceptions. The relators in *Purdy* challenged the statute as violating ballot-access rights protected by the First and Fourteenth Amendments to the United States Constitution. *Id.* at 341.

{¶ 27} To decide the case, we applied the "modified balancing test" adopted by the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). *Purdy* at 342-343. We held that R.C. 3513.04 was constitutional because it imposed only a "slight" burden on First and Fourteenth Amendment rights, which was outweighed by legitimate state interests promoted by the law. *Id.* at 346.

{¶ 28} The constitutionality of R.C. 3513.04 is before us again because the statute was modified in 1998 and subsequent years. The statute previously allowed no exceptions; the amended law now permits "sore-loser" candidates to launch second-chance campaigns for some, but not all, nonpartisan offices.

> No person who seeks party nomination for an office or position at a primary election * * * shall be permitted to become a candidate by nominating petition * * * at the following general election for any office *other than the office of member of the state board of education, office of member of a city, local, or exempted village board of education, office of member of a governing board of an educational service center, or office of township trustee.*

(Emphasis added for new material since 1997.)

{¶ 29} The addition of a limited pool of exempt offices to R.C. 3513.04 raises two distinct constitutional questions, which the parties' briefs unfortunately conflate. The obvious question is whether the exceptions create an equal-

protection problem, an issue that was not before the *Purdy* court. But this case also requires us to revisit the question whether the statute, as amended, continues to promote state interests sufficient to outweigh the burden on relators' First and Fourteenth Amendment ballot-access rights.

### *First Amendment rights:* **Anderson/Burdick** *balancing*

**{¶ 30}** Ballot-access restrictions place burdens on two different, but overlapping, rights enjoyed by electors such as relators Clifford Henry and Michael Vandervort: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). These rights are protected against state encroachment by the First and Fourteenth Amendments. *Id*. at 30-31. The First Amendment also protects the parallel rights of candidates, such as relator Thomas Brown, affected by ballot-access regulations. "[B]allot access cases based on First Amendment grounds have rarely distinguished between the rights of candidates and the rights of voters." *Cook v. Gralike*, 531 U.S. 510, 531, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001) (Rehnquist, C.J., concurring in judgment), citing *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

**{¶ 31}** To assess the constitutionality of a ballot-access law under the First Amendment, a reviewing court engages in the balancing inquiry described in *Anderson* and *Burdick*. *Anderson/Burdick* balancing is a "two-step" inquiry. *See Navarro v. Neal*, 716 F.3d 425, 430 (7th Cir.2013); *Coalition for Free & Open Elections, Prohibition Party v. McElderry*, 48 F.3d 493, 497 (10th Cir.1995).

**{¶ 32}** First, the court must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564, 75 L.Ed.2d 547. Second, the court must weigh the character and magnitude of that constitutional injury against " 'the precise interests put forward by the State

as justifications for the burden imposed by its rule.' " *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059, 119 L.Ed.2d 245, quoting *Anderson* at 789.

{¶ 33} The magnitude of the burden determines the appropriate level of scrutiny the statute will receive. *Purdy*, 77 Ohio St.3d at 343, 673 N.E.2d 1351; *Burdick* at 434. If an election regulation severely burdens the plaintiff's rights, then the statute is subject to strict scrutiny, which is to say the regulation must be narrowly drawn to advance a state interest of compelling interest. *Burdick* at 434. In all other cases, where the ballot-access regulation imposes some burden on First Amendment rights, however minimal, the court must weigh those burdens against the interest asserted by the state. "However slight [the] burden [that a state law imposes] may appear, * * * it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.' " *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (lead opinion), quoting *Norman v. Reed*, 502 U.S. 279, 288-289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992); *see also Crawford* at 211 (Souter, J., dissenting).

### *Equal protection*: **Anderson/Burdick** *balancing*

{¶ 34} Equal protection applies not just to the initial allocation of the franchise, but also to the manner of its exercise. *Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). The court made clear in *Crawford* that equal-protection election challenges are subject to the same *Anderson/Burdick* analysis as are First Amendment ballot-access challenges. *See Northeast Ohio Coalition for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir.2012).

{¶ 35} The state argues that rational-basis review should apply because the classifications at issue are neutral. The state's position misconstrues the law. Rational-basis review applies to laws that draw nondiscriminatory classifications *and impose no burden on the right to vote. McDonald v. Bd. of Election Commrs. of Chicago*, 394 U.S. 802, 807-809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). But

where a plaintiff alleges that the state has burdened voting rights through disparate treatment, the *Anderson/Burdick* balancing test is applicable. *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir.2012).

### *The plurality erroneously utilizes rational-basis scrutiny*

**{¶ 36}** Despite paying lip service to the *Anderson/Burdick* test, the plurality proceeds to analyze the statute under a conventional "rational basis" standard that affords "substantial deference" to the legislature. *State v. Williams*, 88 Ohio St.3d 513, 531, 728 N.E.2d 342 (2000). Consistent with this standard, the plurality opinion rejects relators' challenge because the record will not permit the court "to definitively state that the legislature lacked any basis for its actions." Plurality opinion at ¶ 20.[3]

**{¶ 37}** However, rational-basis review is not appropriate in ballot-access cases. In *Crawford*, the United States Supreme Court rejected the suggestion that *Burdick* allows for any "deferential" standard for a state's important regulatory interests. 553 U.S. at 190, 128 S.Ct. 1610, 170 L.Ed.2d 574, fn. 8. Thus, traditional rational-basis review does not apply to the review of ballot-access statutes. *Price v. New York State Bd. of Elections*, 540 F.3d 101, 108-109 (2d Cir.2008); *Am. Civ. Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1321-1322 (10th Cir.2008); *Rogers v. Corbett*, 468 F.3d 188, 194 (3d Cir.2006); s*ee also Credico v. New York State Bd. of Elections*, E.D.N.Y. No. 10 CV 4555, 2013 WL 3990784 (Aug. 5, 2013), * 20 ("The Court should not apply rational basis review to a challenged law that burdens First Amendment rights * * *"); *Green Party of Arkansas v. Daniels*, 733 F.Supp.2d 1055, 1062 (E.D.Ark.2010) (review of a ballot-access restriction that imposes minimal burdens "is not the rational-basis inquiry advocated by the State"); *Am. Assn. of People with Disabilities v. Herrera*, 580 F.Supp.2d 1195, 1216 (D.N.M.2008) ("a district

---

[3] To ask whether the state had "*any*" basis to justify the statute arguably imposes an even more permissive standard of review than rational-basis scrutiny.

court, to be faithful to the Supreme Court's language and standard in *Anderson v. Celebrezze*, must be careful not to transform the *Anderson* test into a de facto form of strict scrutiny or rational basis test, but must carefully and faithfully apply the two stages that the *Anderson* test requires").

{¶ 38} The more serious legal error in the plurality opinion lies in its misallocation of the burden of proof. Traditional rational-basis review imposes no burden upon the state to prove that the legislation is justified. *Williams*, 88 Ohio St.3d at 531, 728 N.E.2d 342. Rather, the burden falls upon the party challenging the legislation " 'to negative every conceivable basis which might support it.' " *State v. Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, ¶ 27, quoting *Madison v. Kentucky*, 309 U.S. 83, 88, 60 S.Ct. 406, 84 L.Ed. 590 (1940). The plurality opinion reflects this standard. Plurality opinion at ¶ 21 ("It is not sufficient for relators to cast doubt on the constitutionality of this statute, *nor is it the Attorney General's burden to prove the statute constitutional*; rather, relators must show beyond a reasonable doubt that R.C. 3513.04 is unconstitutional" [emphasis added]).

{¶ 39} This is simply an incorrect statement of law. *Anderson* instructs courts to weigh "the precise interests *put forward by the State* as justifications for the burden imposed by its rule." (Emphasis added.) *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564, 75 L.Ed.2d 547. "The State need not provide empirical evidence justifying its interest; however, the State cannot rely on hollow or contrived arguments as justifications." *Trudell v. State*, 193 Vt. 515, 2013 VT 18, 71 A.3d 1235, at ¶ 21; *Price v. New York State Bd. of Elections*, 540 F.3d at 110. Thus, the state plainly has a burden to proffer justifications for the law, along with an explanation of how the law satisfies that state interest.

{¶ 40} The plurality's attempt to distinguish this case based on the specific relief sought—mandamus—ignores 20 years of jurisprudence from this court. In *Purdy*, we discussed the fact that the relief sought was closer in nature

to declaratory judgment and prospective injunction, because in order to establish his "clear right to relief," the relator first needed a declaration that the statute was unconstitutional. *Purdy*, 77 Ohio St.3d at 341-342, 673 N.E.2d 1351. However, we held that it was permissible in limited circumstances, especially in elections matters, to seek mandamus instead of declaratory judgment. *Id*. at 341 ("certain election matters may present extraordinary circumstances. In this regard, declaratory judgment might not provide an adequate remedy in the ordinary course of law").

{¶ 41} The plurality opinion cites absolutely no authority for its proposition that because this case arises in mandamus, relators must satisfy a greater burden to secure ballot access. And in fact, there is no such authority. Relators established that the statute burdened their constitutional rights and that the state could present no justification for that burden. Based on *Crawford*, *Burdick*, *Anderson*, and our own decisions, by prevailing on these points, relators established a clear legal right to relief.

{¶ 42} At the heart of the plurality opinion lies a great mystery: what greater showing could relators muster to overcome the plurality's agnosticism?

{¶ 43} Of greater concern is the plurality's complete lack of comprehension of what constitutes a ballot-access law. The plurality opinion clings to the fiction that it is only the pre-1998 statute that deals with ballot access, whereas "nothing in the post-1998 amendments to the statute * * * burden[s] the right to vote or access to the ballot," as if the two functioned independently.

{¶ 44} This argument is a celebration of form over substance. Apparently, if the statute were drafted to say that "no one is subject to the sore-loser restriction except county court candidates," the plurality would recognize the change as a ballot-access restriction. But because the law is written inversely,

to say who *may* run a second-chance campaign instead of who may *not*, it ceases to be a ballot-access limitation, even though it achieves exactly the same result.

{¶ 45} Moreover, the plurality's determination to divorce this case from its election-law roots, so as to employ a conventional "rational-basis" analysis, ignores the fact that *Crawford* occupies the field when it comes to elections laws. "To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick* * * *." *Crawford*, 553 U.S. at 204, 128 S.Ct. 1610, 170 L.Ed.2d 574 (Scalia, J., concurring). To pretend that this case is something other than an elections case governed by *Anderson*/*Burdick* is to deny the obvious.

### *Legal analysis*

{¶ 46} The state has made no effort to satisfy its burden to put forward justifications for the burdens imposed by amended R.C. 3513.04. Instead, the state offers mere speculation. "[T]he legislature could rationally have decided that the risks associated with second-chance/sore-loser candidacies (and the overall effect on Ohio's electoral integrity) are lessened within the context of educational and/or highly localized positions."

{¶ 47} The notion that boards of education are somehow immune from intraparty conflict is unsupported by evidence, experience, or common sense. To the contrary, boards of education, like every other elected office, are susceptible to the same partisan and political maneuvering that the "sore-loser" statute is designed to prevent. And "highly localized position" is an apt description of the judicial seat for the western division of Ashtabula County.

{¶ 48} Alternatively, the attorney general offers an argument in defense of the statute that is even more speculative and unconvincing: "the legislature could also reasonably think that there was more need to encourage and incentivize candidacy for such positions." A hypothetical desire to "incentivize" people to serve on school boards should not outweigh Brown's First Amendment rights, at

least not in the absence of *any* evidence that R.C. 3513.04 was causing an actual shortage of candidates for these positions.

{¶ 49} The undeniable fact is that the decision to exempt some, but not all, nonpartisan offices from the "sore-loser" statute was arbitrary. There appears to be no articulable reason why these offices were selected or why others were omitted. And when it comes to election laws, it is precisely this sort of arbitrary regulation that the Equal Protection Clause of the United States Constitution forbids.

{¶ 50} In addition, the statute, as amended, no longer justifies the burden on relators' First Amendment rights. The plurality suggests that the amendments have lessened the burden, insofar as more offices are now available to second-chance candidates. But as applied to Brown, as a candidate for this particular judicial office, the burden remains the same.

{¶ 51} Moreover, even if the "slight" burden has now become "slighter," it must still be outweighed by some legitimate state interest that the law furthers. The interests that were deemed adequate in *Purdy*—avoiding confusion caused by second-chance candidates—no longer has force when second-chance candidates are able to run for some, though not all, offices in the general election.

{¶ 52} The plurality speculates that confusion could result from a second-chance candidate such as Brown seeking a judicial office in the primary and then a different judicial office in the general election. The plurality notes that the same risk of confusion does not exist for second-chance candidates for state board of education, because nomination for that position is by petition only, not by primary. R.C. 3513.259.

{¶ 53} The flaw in this argument is that primaries are possible, though not automatic, for all the other positions listed in the exception portion of R.C. 3513.04. Trustee offices can be subject to primary election if a majority of the electors petitions for a primary. R.C. 3513.253. And a board of education of a

17

city, local, or exempted village school district or governing board of an exempted educational service may establish a nonpartisan primary by resolution. R.C. 3513.256(A). So the same possibility of confusion exists with second-chance candidates running for one board of education in a primary and a different board of education in the general election.

{¶ 54} Even though the burden on relators' constitutional rights is slight, the state has not presented *any* interest to justify the distinction drawn by the amended statute. I would therefore hold that the language added to R.C. 3513.04 renders the statute unconstitutional.

### *Remedy*

{¶ 55} Having determined that R.C. 3513.04 is unconstitutional, I address the question of remedy.

{¶ 56} The dissent agrees that amended R.C. 3513.04 is unconstitutional and would therefore grant the writ and place Brown's name on the general election ballot. But there is no explanation for how this result has been reached. Rewriting the statute to include county courts on the list of excepted offices would be an exercise of power that this court does not possess. So the only alternative is that the dissent must consider R.C. 3513.04 unconstitutional in its entirety, but the dissent has not established that such a broad remedy is necessary.

{¶ 57} R.C. 1.50 provides that statutory provisions are presumptively severable. The test of severability is " 'whether the remaining parts of the article, standing alone and without reference to the unconstitutional sections, can be effective and operable.' " *State ex rel. Doersam v. Indus. Comm.*, 45 Ohio St.3d 115, 121, 543 N.E.2d 1169 (1989), quoting *State ex rel. King v. Rhodes*, 11 Ohio St.2d 95, 101, 228 N.E.2d 653 (1967). The remainder of R.C. 3513.04 is plainly capable of standing alone without the arbitrary list of exemptions that have created the constitutional problem.

**{¶ 58}** I would therefore strike the language added in the 1998 amendment and return to the statute that existed at the time that this court decided *Purdy,* 77 Ohio St.3d 338, 673 N.E.2d 1351. And once this is done, the pyrrhic nature of Brown's victory becomes apparent. R.C. 3513.04 would still bar Brown from the November ballot; even though his constitutional argument is meritorious, he would nevertheless not be entitled to a writ of mandamus.

**{¶ 59}** For these reasons, I concur in the judgment reached by the plurality.

LANZINGER, J., concurs in the foregoing opinion.

_____

**PFEIFER, J., dissenting.**

**{¶ 60}** There is no legitimate reason to allow respondent Ashtabula County Board of Elections to refuse to place relator Thomas Brown's name on the November 4, 2014 ballot. In *State ex rel. Purdy v. Clermont Cty. Bd. of Elections*, 77 Ohio St.3d 338, 347, 673 N.E.2d 1351 (1997) (Moyer, C.J., dissenting), Chief Justice Moyer stated that "application of the [sore-loser] statute burdened Purdy's and Tighe's constitutional rights by prohibiting their candidacies." The same is true of Brown.

**{¶ 61}** Brown's constitutional right to ballot access, when he is an otherwise eligible candidate, is being infringed by the application of R.C. 3513.04. There is no great principle behind the statute and it ought not be entitled to a presumption of constitutionality. *See Wisconsin v. Pelican Ins. Co*., 127 U.S. 265, 297, 8 S.Ct. 1370, 32 L.Ed. 239 (1888), *overruled on other grounds*, *Milwaukee Cty. v. M.E. White Co.*, 296 U.S. 268, 56 S.Ct. 229, 80 L.Ed. 220 (1935); *Ohio Grocers Assn. v. Levin*, 123 Ohio St.3d 303, 2009-Ohio-4872, 916 N.E.2d 446, ¶ 70-81 (Pfeifer, J., dissenting). When a statute infringes on a fundamental constitutional right, we ought not acquiesce because of an

19

unwarranted presumption of constitutionality. Indeed, the presumption should go the other way; the statute should be presumed unconstitutional.

{¶ 62} Election laws that limit ballot access for prospective candidates are subject to review depending on the level of the limitation. *Purdy*, 77 Ohio St.3d at 343, 673 N.E.2d 1351. If we assume, as the plurality opinion does, that R.C. 3513.04 is a reasonable, nondiscriminatory restriction, then it can be justified by an important regulatory interest. *Id.*, citing *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). As support for the interests that justify R.C. 3513.04, the attorney general cites the following statement from *Purdy*: "Ohio clearly has a legitimate interest in prevent potential conflicts among party members, an interest in preventing the possibility of voter confusion, and an interest in preventing candidacies that may conceivably be prompted by short-range goals." *Id.* at 346.

{¶ 63} The importance of these interests is a chimera. Preventing potential conflicts among party members may be a legitimate interest, but how preventing an eligible candidate from appearing on the ballot for a nonpartisan office advances that interest is obscure and unexplained. Minimizing the possibility of voter confusion may also be a legitimate interest, but not enough to prevent an eligible candidate from running for office. Moreover, only the most well-informed voters are likely to realize that a candidate for one of the offices in this case had been a candidate for the other office earlier in the year and, because they are well-informed, they are unlikely to be confused. The claim that Ohio has an interest in preventing candidacies that may conceivably be prompted by short-term goals is absurd, and that interest is clearly unmanageable. For one thing, politics is increasingly an endeavor devoted to short-term goals; for another, who is to judge whether a goal is short term? In short, none of the arguments suggested by the attorney general advance important regulatory interests—and they are insufficient to justify burdening the constitutional right to ballot access.

**{¶ 64}** There is no legitimate reason to prevent Brown's name from appearing on the ballot in a nonpartisan election. I would grant the writ of mandamus. If the only way to do that is to overrule *Purdy*, then I would do that. I dissent.

_____

Louis E. Grube, for relators.

Nicholas A. Iarocci, Ashtabula County Prosecuting Attorney, and Shelley M. Pratt, Assistant Prosecuting Attorney, for respondents.

Michael DeWine, Attorney General, and Zachary P. Keller, Assistant Attorney General, for intervening respondent.

Taft, Stettinius and Hollister, L.L.P., and Donald C. Brey, urging denial of the writ for amicus curiae, David Schroeder.

_____