Per Curiam.
*28 {¶ 1} In this expedited election case, relator, Citizens for Responsible Green Government ("the committee"), seeks a writ of mandamus to compel respondents, city of Green, Green Finance Director Steven Schmidt, and the Summit County Board of Elections, to place a referendum on the November 6, 2018 general-election ballot. For the reasons set forth below, we dismiss the complaint based on laches and deny the committee's motion for leave to supplement the evidence.
The evidence in the record
{¶ 2} The present case arises from the efforts of Nexus Gas Transmission, L.L.C. ("Nexus"), to construct an interstate natural-gas pipeline system, which would run through the city of Green. On August 25, 2017, the Federal Energy Regulatory Commission issued a Certificate of Public Convenience and Necessity to Nexus, authorizing construction of an interstate natural-gas pipeline. On September 19, 2017, the director of the Ohio Environmental Protection Agency issued a Section 401 Water Quality Certification for the project. See Federal Water Pollution Control Act, 33 U.S.C. 1341.
{¶ 3} Nexus sought to obtain easements and rights of way through the city to allow for construction of the pipeline. But the city opposed the project. The city appealed the director's decision to the Environmental Review Appeals Commission and separately petitioned the United States Court of Appeals for the Sixth Circuit to review the director's issuance of the certification. Green v. Ohio Environmental Protection Agency , 6th Cir. No. 17-4016.
{¶ 4} Meanwhile, on October 2, 2017, Nexus filed in the United States District Court for the Northern District of Ohio a complaint seeking an order of condemnation of permanent and temporary easements across multiple parcels of privately owned land.[1]
*29 Nexus Gas Transm., L.L.C. v. Green , N.D.Ohio No. 5:17-cv-02062-JRA. On December 28, 2017, the court ruled that Nexus had the right to condemn easements through the city and issued a preliminary injunction authorizing Nexus to immediately possess certain properties for the limited purposes of conducting environmental and other surveys. The city *240 appealed the district court's judgment to the Sixth Circuit Court of Appeals.
{¶ 5} The city entered into a settlement agreement with Nexus, effective January 31, 2018, to resolve the litigation. In return for Nexus's payment of $7,500,000, the city agreed, among other things, to grant Nexus easement rights across certain properties.
{¶ 6} On February 5, 2018, the city's mayor introduced Resolution No. 2018-R09, captioned "A Resolution Approving a Settlement of Pending Litigation, Authorizing the Mayor to Enter Into a Settlement Agreement and Related Documents Thereto, And Declaring An Emergency." Section One of the resolution approved the settlement agreement, which was attached as an exhibit and incorporated by reference. Section Four declared an emergency and provided that the resolution would become effective immediately if approved by three-fourths of the city-council members.
{¶ 7} On February 7, 2018, the resolution passed by a four-to-three vote. Because it failed to garner three-fourths of the votes, however, it did not pass as an emergency matter. See Green Codified Ordinances 4.10(A) ("Each emergency resolution and ordinance shall contain a statement of the necessity for such emergency action, and its enactment shall require the affirmative vote of three-fourths (3/4) of the members of Council"). So City Council Clerk Molly Kapeluck crossed out the words "And Declaring an Emergency" from the title, as well as the whole of Section Four, before the appropriate officials signed to indicate passage of the resolution.
{¶ 8} On March 8, 2018, the committee submitted 71 part-petitions to Finance Director Schmidt, calling for a referendum on Resolution No. 2018-R09. Attached to each part-petition was a copy of the resolution as introduced , not the certified version containing the clerk's cross-outs. The copy of the resolution appended to the referendum petition also did not include three other components that were part of the certified version: the signatures of the city-council president, the mayor, and the city law director; the roll-call tabulation of the votes of city-council members; and the settlement agreement.
*30 {¶ 9} On April 19, 2018, the Summit County Board of Elections validated 1,284 petition signatures. Of those, however, it called into question the validity of 49 signatures, leaving the final decision on those signatures to city council. The parties do not dispute that even the lower figure of 1,235 signatures would be sufficient for the referendum to qualify for the ballot.
{¶ 10} Once a county board of elections certifies a sufficient number of signatures, the auditor or clerk of the municipality certifies the sufficiency and validity of the petition to the board, for placement of the referendum on the ballot. R.C. 731.29. In Green, the finance director, as the fiscal officer for the city, is the equivalent of the auditor. Green Codified Ordinances 6.3(B).
{¶ 11} On June 11, 2018, Schmidt sent a letter to the director of the board of elections declining to certify the petition because he deemed it "facially invalid and insufficient." Schmidt characterized the petition as misleading because the attached copy of the resolution differed from the certified version of the resolution in the ways described above. He also suggested the possibility that the underlying ordinance was an administrative action and therefore not subject to referendum.
Procedural history
{¶ 12} The committee commenced this suit for a writ of mandamus on August 6, 2018. The committee requested a writ of mandamus to (1) compel Schmidt to certify *241 the petition to the board of elections for inclusion of the referendum on the next general-election ballot and (2) compel the board to place the referendum on the ballot. We imposed an expedited briefing schedule pursuant to S.Ct.Prac.R. 12.08. 153 Ohio St.3d 1457, 2018-Ohio-3132, 103 N.E.3d 834.
{¶ 13} The committee filed its merit brief on August 10, three days before respondents' answer was due. Because of the committee's early filing, the city and Schmidt (collectively, "the city") moved for additional time to submit briefs and evidence, which we granted. After the city filed its merit brief, the committee filed a reply brief along with a motion for leave to submit three additional exhibits into evidence. The city filed a memorandum in opposition to the motion on August 21.
{¶ 14} We have also received a merit brief from the board of elections as well as an amicus brief in support of respondents from Nexus.
Legal analysis
{¶ 15} To prevail in this mandamus case, the committee must establish, by clear and convincing evidence, a clear legal right to the requested relief, a clear legal duty on the part of the city and/or the board of elections to provide that relief, and the lack of an adequate remedy in the ordinary course of the law. State ex rel. Ebersole v. Powell City Council , 149 Ohio St.3d 501, 2017-Ohio-509, 75 N.E.3d 1245, ¶ 10. Given the proximity of the November election, the committee lacks an adequate remedy in the ordinary course of the law.
*31 State ex rel. Greene v. Montgomery Cty. Bd. of Elections , 121 Ohio St.3d 631, 2009-Ohio-1716, 907 N.E.2d 300, ¶ 10.
{¶ 16} The city and amicus curiae contend that the committee's complaint is barred by the doctrine of laches. Laches may bar relief in an election-related matter if the party seeking relief has failed to act with the " 'utmost diligence.' " State ex rel. Monroe v. Mahoning Cty. Bd. of Elections , 137 Ohio St.3d 62, 2013-Ohio-4490, 997 N.E.2d 524, ¶ 30, quoting State ex rel. Fuller v. Medina Cty. Bd. of Elections , 97 Ohio St.3d 221, 2002-Ohio-5922, 778 N.E.2d 37, ¶ 7. The elements of a laches defense are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party. State ex rel. Carrier v. Hilliard City Council , 144 Ohio St.3d 592, 2016-Ohio-155, 45 N.E.3d 1006, ¶ 8.
{¶ 17} As noted, Schmidt, Green's finance director, declared the referendum petition "facially invalid and insufficient" on June 11, 2018. The committee filed this mandamus complaint on August 6, 56 days later. The committee argues that there was no unreasonable delay because, it suggests, June 11 is not the date on which the lapse of time should begin to be measured. The committee asserts that it sent a letter to the interim law director on July 30, asking him to file suit against Schmidt pursuant to R.C. 733.59, and that it promptly filed suit six days later, after the interim law director had failed to respond to the letter. But the committee does not explain why it waited seven weeks before sending the demand letter.
{¶ 18} Alternatively, the complaint appears to suggest that the committee either was unaware of the June 11 letter until much later or was affirmatively misled into believing that the city might change its position. The complaint alleges that "[a]t no time did the City of Green inform [the committee] that the City was refusing to advance the referendum to the Board of Elections for placement on the ballot." But although it is true that the *242 committee was not copied as a recipient on Schmidt's June 11 letter, there is no evidence, or even an allegation, to suggest that it was unaware of the city's decision until some date closer to the filing of the complaint.[2] To the contrary, in its reply brief, the committee admits that it was aware of the decision "on or about June 13." *32 {¶ 19} But despite conceding its contemporaneous awareness of the city's decision, the committee contends that its inaction should be excused because it "was also aware that [Interim Law Director William] Chris directed the law firm of Brennan, Manna, and Diamond ["BMD"] to review and update its legal opinion on July 2, 2018. As demonstrated in [the committee's] Merit Brief, the legal opinion of July 2, 2018 by [BMD] was severely flawed." None of this information is substantiated by the record. The record includes a copy of a May 16, 2018 legal opinion that BMD submitted to the city; it is attached to the city's press release announcing the decision not to certify the petition. But there is no reference to a second legal opinion from BMD in relator's complaint or merit brief, nor, more importantly, is there any evidence that the committee relied on the prospect of a second opinion when it delayed filing suit-much less evidence to establish the reasonableness of that delay.
{¶ 20} To try to remedy the absence of any evidence of a second legal opinion from BMD, the committee on August 20, 2018, filed a motion for leave to file an additional, unauthenticated exhibit (proposed Exhibit 11) into evidence. That exhibit purports to show that on June 28, 17 days after the date of Schmidt's letter, Councilman Matt Shaughnessy sent an e-mail to Interim Law Director Chris containing "an official demand for a legal opinion regarding the assumptions used in the [BMD] legal opinion" regarding the validity of the petition. Chris responded on July 2, noting that he had shared the request with BMD over the weekend. Chris also indicated that he had shared the substance of Shaughnessy's e-mail with Roderick Linton Belfance, L.L.P., another law firm hired by the city to provide legal guidance on this matter, and that the Roderick firm continued to agree with the legal opinion provided by BMD. In an e-mail dated July 10, Chris clarified that the Roderick firm did not prepare a supplemental written opinion.
{¶ 21} These e-mails, even if admitted into evidence, would not rebut the city's allegation of unreasonable delay on the part of the committee. Contrary to the representation in the committee's reply brief, there is no evidence that Chris "directed" BMD to "review and update its legal opinion." There is no evidence that the committee was aware of Councilman Shaughnessy's June 28 demand letter at the time. And there is no explanation for why the committee took no action to initiate a lawsuit between June 11 and June 28. The insinuation that the committee was awaiting supplemental, possibly favorable legal guidance has no basis in fact.
*33 {¶ 22} More generally, the committee asserts that its delay was excusable because the exhibits in the case are voluminous and its attorney had to juggle this matter with other cases and priorities.
*243 This assertion ignores the fact that a similar argument could likely be made in every election case and, if successful, would swallow the doctrine of laches.
{¶ 23} In our view, the length of time between the city's rejection of the petition and the filing of this suit was unreasonable, the committee was aware of its alleged injury during that time, and it has no reasonable excuse for its delay. We turn, then, to the fourth element of the laches defense, the question of prejudice.
{¶ 24} Generally, "the application of laches requires some sort of prejudice to the other party." State ex rel. Willke v. Taft , 107 Ohio St.3d 1, 2005-Ohio-5303, 836 N.E.2d 536, ¶ 18.
Normally, this prejudice in expedited election cases occurs because [the] relators' delay prejudices [the] respondents by making the case an expedited election case * * *, which restricts [the] respondents' time to prepare and defend against [the] relators' claims, or impairs boards of elections' ability to prepare, print, and distribute appropriate ballots because of the expiration of the time for providing absentee ballots.
Id. By rule, an election matter is automatically expedited if filed within 90 days prior to the relevant election. S.Ct.Prac.R. 12.08(A)(1). Here, the committee filed its complaint 92 days before the election. Because it filed before the date on which complaints are automatically expedited, the committee argues, laches cannot apply.
{¶ 25} It is true that when a relator's unreasonable delay in filing a mandamus case causes the matter to become an expedited election matter when filed, that delay is presumed to constitute prejudice for laches purposes. State ex rel. Duclos v. Hamilton Cty. Bd. of Elections , 145 Ohio St.3d 254, 2016-Ohio-367, 48 N.E.3d 543, ¶ 11. But the committee cites no authority for the converse proposition: that laches cannot apply so long as the case is ultimately filed more than 90 days before the election. To the contrary, laches is an equitable doctrine that may potentially apply to any mandamus claim; it is not a creature of election law. State ex rel. Carver v. Hull , 70 Ohio St.3d 570, 577, 639 N.E.2d 1175 (1994) ("The question whether laches has barred a claim in mandamus rests in the court's sound discretion"). The prejudice that exists when unreasonable delay causes an election case to become expedited is merely one possible type of prejudice, not the only kind that may trigger laches.
*34 {¶ 26} The committee's unreasonable delay and decision to file its complaint so close to the 90-day deadline have caused this case to become expedited. The committee's own complaint recognized the need for urgency caused by its delay in filing and expressly asked us to order "expedited consideration of this important elections matter under S.Ct.Prac.R. 12.08." That we would expedite the case was entirely foreseeable; we routinely expedite election matters filed significantly further in advance of the election than was the complaint in this case. See, e.g. , State ex rel. McCann v. Delaware Cty. Bd. of Elections , 153 Ohio St.3d 1445, 2018-Ohio-2926, 102 N.E.3d 502 (complaint filed 105 days before election); State ex rel. Guest v. Husted , 153 Ohio St.3d 1436, 2018-Ohio-2707, 101 N.E.3d 466 (complaint filed 137 days before election).
{¶ 27} Today we conclude that prejudice exists for purposes of a laches analysis in election cases not only when the case is automatically expedited because the relator files the complaint after the 90-day cut-off, but also when the relator files the complaint so close in time to that *244 deadline that expediting the proceedings becomes a practical necessity. Although a laches defense "rarely prevails in election cases," Duclos at ¶ 8, we conclude that laches bars the relief requested in this case due to the committee's failure to exercise any diligence whatsoever. We therefore dismiss the complaint and decline to address the merits of the issues presented therein.
{¶ 28} We also deny the committee's motion for leave to supplement the evidence. As discussed above, proposed Exhibit 11 would not alleviate the laches problem. The other two proffered exhibits (Exhibits 12 and 13) purport to be hyperlinks to YouTube videos of statements made by Mayor Gerard Neugebauer and former Law Director Diane Calta, respectively. These exhibits have been proffered to address whether the underlying ordinance is legislative or administrative, a legal question we need not reach.
Motion denied and cause dismissed.
O'Connor, C.J., and French and Fischer, JJ., concur.
O'Donnell, DeWine, and DeGenaro, JJ., concur in judgment only.
Kennedy, J., dissents, with an opinion.

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, * * * it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts.
15 U.S.C. 717f(h).

The evidence submitted by the city includes two newspaper articles, both dated June 13, providing comments on the rejection of the petition from the committee's attorney, thereby demonstrating the committee's constructive knowledge. However, a newspaper article containing a purported statement from the agent of an adverse party is hearsay and may not be considered as evidence. State ex rel. Am. Civ. Liberties Union of Ohio, Inc. v. Cuyahoga Cty. Bd. of Commrs. , 128 Ohio St.3d 256, 2011-Ohio-625, 943 N.E.2d 553, ¶ 30.